IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,     )
     )
     )     CRIMINAL CASE NO.
v.     )     1:09-CR-00438-JEC-LTW
     )
ANGEL FLORES-URIOSTEGUI and     )
EDGAR SAUCEDO-ESPINOZA,     )
     )
     Defendants.     )

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING CASE READY FOR TRIAL

This case is presently before the Court on Defendants Angel Flores-Uriostegui and Edgar Saucedo-Espinoza's Motions to Suppress Evidence and Statements from an allegedly illegal seizure and subsequent search of Defendants' persons and apartment. Docket Entries [20, 23, 25, 29]. An evidentiary hearing was held on January 25, 2010. Docket Entry [31]. Defendant Saucedo-Espinoza subsequently filed a Supplemental Motion to Suppress evidence obtained from an allegedly invalid search warrant, and both Defendants filed perfected motions to suppress. Docket Entries [33, 38, 48]. The Government responded to Defendants' motions, and Defendant Saucedo-Espinoza filed a reply. Docket Entries [44, 49, 51]. For the reasons set forth below, this Court **RECOMMENDS** that Defendant Flores-Uriostegui and Saucedo-Espinoza's Motions

to Suppress be **GRANTED** and Defendant Saucedo-Espinoza's Supplemental Motion
to Suppress be **DENIED AS MOOT**.  Docket Entries [20, 23, 25, 29, 33, 48].

## **BACKGROUND FACTS**

On October 7, 2009, a federal grand jury returned a seven-count indictment
against Defendants.  Docket Entry [1].  The indictment alleges that (1) beginning on a
date unknown but continuing until no earlier than on or about July 17, 2009, Defendants
did willfully combine, conspire, confederate, agree, and have a tacit understanding with
one another and others to knowingly and intentionally possess with the intent to
distribute 500 grams or more of a mixture or substance containing methamphetamine and
500 grams or more of a mixture or substance containing cocaine in violation of 21 U.S.C.
§§ 841(a)(1), 841(b)(1)(A)(viii), 841(b)(1)(B)(ii), and 846 (Count One); (2) on or about
July 17, 2009, Defendants, aided and abetted by each other, knowingly and willfully
possessed with the intent to distribute 500 grams or more of a mixture or substance
containing methamphetamine in violation of 21 U.S.C. § 841(b)(1)(A)(viii) and 18
U.S.C. § 2 (Count Two); (3) on or about July 17, 2009, Defendants, aided and abetted
by each other, knowingly and willfully possessed with the intent to distribute 500 grams
or more of a mixture or substance containing cocaine in violation of 21 U.S.C.
§ 841(b)(1)(B)(ii) and 18 U.S.C. § 2 (Count Three); and (4) on or about July 17, 2009,

2

Defendants, aided and abetted by each other, knowingly possessed firearms in furtherance of a drug trafficking crime related to possession with the intent to distribute methamphetamine and cocaine in violation of 18 U.S.C. §§ 924(c)(1)(A)(I) and 2 (Counts Four and Five). The indictment separately charges Defendant Flores-Uriostegui and Defendant Saucedo-Espinoza as aliens illegally present in the United States and knowingly possessing firearms in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2) (Counts Six and Seven). The indictment further includes a forfeiture provision against Defendants. On October 15, 2009, Defendants were arraigned and entered pleas of not guilty on all counts lodged against them. Docket Entries [9, 11].

### MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AS FRUITS OF UNLAWFUL SEARCH AND SEIZURE

Both Defendants move to suppress evidence and statements resulting from their initial stop by Cobb County police officers, alleging that such evidence and statements were fruits of an initially unlawful confrontation by police officers in violation of their Fourth Amendment rights. Since both motions raise the same issues, Defendants' motions and the Government's responses are considered together.

## I.   FACTUAL BACKGROUND

On July 17, 2009, Cobb County Police Officers Lewis P. Gray and Lee Turman

were in uniform and traveling in a marked patrol car when they drove into Belmont Crossings Apartments at approximately 6:00 p.m.  (Transcript of Evidentiary Hearing, January 25, 2010, hereinafter "Tr.," 6-8, 11, 50-51, 54.)  Both officers were part of the Violent Incident Prevention and Early Response Team ("VIPER") created in October 2007 for the purpose of suppressing crime in high crime areas.  (Tr. 7, 18, 50.)  The officers testified that the Belmont Crossings apartment complex was a high crime area and known for a heightened drug presence.  (Tr. 9-10, 28, 39-40, 51, 63.)  The officers had received information that apartments in that complex were being used to store large amounts of drugs and that the police had engaged in a car chase with a stolen vehicle at that complex the day before.  (Tr. 9, 39, 63.)

While patrolling in the parking lot near building K of the apartment complex, Officers Gray and Turman observed two males, Defendants Saucedo-Espinoza and Flores-Uriostegui, sitting inside a vehicle parked in front of building K.  (Tr. 10.) From about fifty to one hundred feet away, Officers Gray and Turman observed Defendants sitting motionless in a vehicle for approximately two to three minutes.  (Tr. 10, 27-28, 40, 64, 66.)[1]  The officers observed that the occupants did not move the vehicle or make

---

[1]According to Officer Gray, the officers observed Defendants for less than two minutes.  (Tr. 10, 27.)  According to Officer Turman, the officers observed Defendants for "maybe two, three minutes."  (Tr. 66.)

4

any effort to move or leave the vehicle, the brake lights were not on, and nobody came over to the vehicle. (Tr. 10.) According to the officers, the fact that Defendants were sitting in a vehicle in a high crime area and made no effort to move the vehicle or exit the vehicle constituted suspicious behavior that Defendants were loitering for illegal purposes. (Tr. 28-30, 41-42, 44-45, 51-52, 65-68.) As described by Officer Gray, "with all of my knowledge and experience with the complex, I find it odd that there would be two people simply sitting in a vehicle, no brake lights on, doesn't appear that anybody is coming over to the vehicle, it doesn't appear that they are planning on leaving." (Tr. 28.) After observing Defendants for several minutes, the officers—without turning on their blue lights—drove and parked their marked patrol car at a position partially blocking the rear of Defendants' vehicle which was facing the apartments. (Tr. 11, 27, 31-32, 45, 52, 64-65; see also Def. Saucedo-Espinoza's Ex. D-9 (using red pick-up truck to depict approximate location of Defendants' vehicle).) At this point, both officers testified that Defendants were not free to leave. (Tr. 32-33, 67.) According to Officer Gray, based on the position of the patrol car in back of Defendants' car and the small area in the parking lot, Defendants would have had a difficult time getting out. (Tr. 31-32, 45.) According to Officer Turman, Defendants would not have been able to get out at all. (Tr. 65, 67.)

5

After parking the marked patrol car, Officer Gray approached Defendant Saucedo-Espinoza on the driver's side to ask him what he was doing in the complex. (Tr. 11-12.) When Defendant Saucedo-Espinoza responded he was there to visit a friend, Officer Gray asked for and received Defendant's identification, repeated his earlier question, and learned that Defendant Saucedo-Espinoza resided in Apartment K-5 of the complex. (Tr. 13.) In and about the same time, Officer Turman approached Defendant Flores-Uriostegui on the passenger side of the vehicle and asked if Defendant Flores-Uriostegui was a resident of the property. (Tr. 11, 53.) Defendant Flores-Uriostegui told Officer Turman that he lived in Apartment K-5 and that both Defendants had just come from that apartment. (Id.) After obtaining identification from both Defendants and running them through the Georgia Crime Information Center ("GCIC"), the officers found that neither Defendant had a license to lawfully operate the car and that neither Defendant had any outstanding warrants. (Tr. 33-34, 55-56.)

Without returning the identification to Defendants, the officers asked Defendants to step out of the car and move to its rear. (Tr. 16, 34-35.) Officer Gray proceeded to pat-down Defendant Saucedo-Espinoza while Officer Turman performed a pat-down of Defendant Flores-Uriostegui. (Tr. 17-19, 34-35, 58-60.) Officer Gray felt two small plastic bags in Defendant Saucedo-Espinoza's right front pocket, and Officer Turman

felt and heard the plastic crinkle of a large bulk in Defendant Flores-Uriostegui's front left pocket.  (Tr. 18, 58.)  Both officers testified that they asked and received permission to search inside each Defendants' pockets while performing the pat-down.  (Tr. 19, 58-60.)  The officers discovered cocaine on Defendants during these pat-downs, and both Defendants were taken into custody.  (Tr. 18, 21, 60.)

Officer Gray called for a canine unit which later alerted the officers for drugs at Apartment K-5's door.  (Tr.21,  23, 35-36.)  Both Defendants were arrested and a search warrant for Apartment K-5 was subsequently issued based on the information obtained in the initial encounter with the officers, the subsequent pat-downs, and the canine unit alert for drugs.  (Tr. 23-24; see also Gov't's Ex. 1 (affidavit and application for search warrant of Apartment K-5).)

## II.   LEGAL ANALYSIS

## A.   Defendants' Initial Encounter with Officers Gray and Turman

Defendants argue that their initial encounter with the officers was a warrantless seizure that was not based on specific and articulable facts necessary to support reasonable suspicion and, consequently, that the resulting statements and evidence obtained must be suppressed as fruits of an illegal seizure.  In response, the Government argues that the observation of Defendants sitting motionless for two to three minutes

7

inside a vehicle in a high-crime area supports a reasonable suspicion that criminal activity was afoot and justifies their seizure of Defendants.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV; see also Mapp v. Ohio, 367 U.S. 643, 655-56 (1961) (holding Fourth Amendment rights enforceable against states through the Fourteenth Amendment). In determining whether a search or seizure is reasonable, the Court must ask whether an officer's action was justified at its inception and whether it was reasonably related in scope to the circumstances justifying the interference in the first place. Terry v. Ohio, 392 U.S. 1, 19-20 (1968); United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000). A "seizure" of a person under the Fourth and Fourteenth Amendments occurs when "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." United States v. Dunn, 345 F.3d 1285, 1288 (11th Cir. 2003) (quoting Kaupp v. Texas, 538 U.S. 626, 629 (2003)); United States v. Baker, 290 F.3d 1276, 1278-79 (11th Cir. 2002). Generally, a search or seizure must be supported by probable cause. Dunn, 345 F.3d at 1288. Under Terry, however, "minimally intrusive searches and seizures of the person are permissible when a law

enforcement officer has an objectively reasonable suspicion that criminal activity may be afoot." Id. at 1289 (internal quotation marks omitted). Although reasonable suspicion does not demand as strong a showing as probable cause and requires less than a preponderance of the evidence, it nonetheless requires at least a minimal level of objective justification for making an investigatory stop. Illinois v. Wardlow, 528 U.S. 119, 123 (2000); Powell, 222 F.3d at 917; see also United States v. Cortez, 449 U.S. 411, 417 (1981) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."). The evaluation of whether reasonable suspicion exists must be determined on a case-by-case basis and take into account the totality of circumstances. United States v. Gordon, 231 F.3d 750, 757 (11th Cir. 2000); United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990). An officer must be able to articulate more than an "inchoate and unparticularized suspicion or hunch" of criminal activity. Dunn, 345 F.3d at 1289 (internal citations and quotation marks omitted); Powell, 222 F.3d at 917. To justify a Terry stop, the reasonableness standard requires the officer to "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." United States v. Griffin, 109 F.3d 706, 708 (11th Cir. 1997); Tapia, 912 F.2d at 1370.

1.      <u>Defendants Were "Seized" When the Officers Blocked Their Vehicle with the Patrol Car</u>

In the present case, the Government does not directly refute Defendants' assertion that their seizure by Officers Gray and Turman began from the time the officers parked their patrol car in back of Defendants' vehicle.  At various points in its response, however, the Government alludes to a contrary position that the seizure occurred after the Defendants' initial encounter with the officers.  For example, the Government's statement of facts asserts that the first point in time where Defendants were not "free to leave" occurred after the officers had begun questioning Defendants, and elsewhere in its brief the Government states that "the situation as it existed at the time the officers encountered Defendants' vehicle rose to a level of reasonable suspicion." (Gov't's Resp. to Def.'s Saucedo-Espinoza's Mot. to Suppress 4, 10; Gov't's Resp. to Def.'s Flores-Uriostegui's Mot. to Suppress 4, 9-10.)  Despite the Government's apparent argument that the initial encounter escalated into a warrantless seizure justified by reasonable suspicion, Defendants correctly argue that their seizure by the officers began from the moment the officers drove toward them and parked the marked patrol car behind their vehicle.

In the present case, both officers testified that the location of their parked patrol car behind Defendants' vehicle made it difficult, if not impossible, to leave. (Tr. 31-32, 45, 65, 67.) Both officers subsequently approached each of the Defendants on either side of the car in uniform and began to question Defendants as to why they were at the apartment complex. (Tr. 11-12, 53.) Although the officers did not turn their blue lights on (Tr. 11), Defendants' vehicle was physically obstructed in a small area by a marked patrol car occupied by two uniformed police officers. (Tr. 8, 11, 31-32, 45, 64-65.) Under these circumstances, a reasonable person in Defendants' position would not have felt free to leave upon the blocking of his or her car by a marked patrol car. See, e.g., United States v. See, 574 F.3d 309, 313 (6th Cir. 2009) (affirming district court's finding that blocking of defendant's car with marked patrol car was a warrantless Terry seizure); United States v. Packer, 15 F.3d 654, 657 (7th Cir. 1994) (holding that the parking of officers' vehicles in front and in back of defendant's car with lights on was a Terry stop); United States v. Berry, 670 F.2d 583, 597 (5th Cir. Unit B 1982) (explaining that "blocking an individual's path or otherwise intercepting him to prevent his progress in any way is a consideration of great, and probably decisive, significance" in finding a seizure).

11

2.     The Initial Seizure Was Not Supported by Reasonable Suspicion

Defendants further argue that Officers Gray and Turman lacked any information that could rise to the level of reasonable suspicion to justify their warrantless seizure. In response, the Government argues that reasonable suspicion to seize Defendants existed when Officer Gray and Turman observed Defendants sitting motionless in their vehicle in a high crime area.  Tellingly, the Government does not identify any specific criminal activity associated with Defendants' behavior that warranted the officers' intrusion upon Defendants' Fourth Amendment rights.[2]   Even assuming that the Government is arguing that Defendants' behavior provided an objective basis for suspecting illegal drug activity or loitering, moreover, the totality of the circumstances here do not support the conclusion that reasonable suspicion of criminal activity existed at the time Officers Gray and Turman seized Defendants.

---

[2]Although the Government correctly asserts that reasonable suspicion "may be formed by observing exclusively legal activity," see Gordon, 231 F.3d at 754, those observations must still altogether provide some objective manifestation that the person stopped is engaged, or is about to be engaged, in criminal activity.  Cortez, 449 U.S. at 417; see also Tapia, 912 F.2d at 1370-71 ("[T]he relevant inquiry in evaluating the presence of reasonable suspicion is not whether particular conduct is innocent or guilty but the degree of suspicion that attaches to particular types of noncriminal acts.") (internal quotation marks omitted).

First, the facts available to the officers prior to their seizure of the Defendants show no objective manifestation that Defendants were about to commit or in the process of committing a crime.  Cortez, 449 U.S. at 417.  At around 6:00 p.m., the officers observed, from about fifty to a hundred feet away, Defendants sitting for two to three minutes inside a vehicle parked in front of an apartment building inside an apartment complex.  (Tr. 6-10, 27-28, 40, 66, 69.)  The Defendants neither fled, nor attempted to move themselves or the vehicle.  (Tr. 28-30, 41-42, 51-52, 65-69.)  Prior to the officers' approach, moreover, the officers did not observe any small movements or fidgeting from the Defendants.  (Tr. 40, 69.)  Nor did the officers have any specific information linking Defendants' vehicle or their apartment to a particular crime.  (Tr. 39-40, 63.)  Although the Government points out that Defendants were giving inconsistent answers and exhibiting nervous behavior upon questioning by the officers, Defendants correctly argue that these observations were not made until *after* the officers had blocked Defendants' vehicle and already seized Defendants.  Thus, the only factual basis available to support the officers' initial seizure of Defendants is their observations from about fifty to a hundred feet away that Defendants were sitting motionless inside a car parked in a high crime area.

13

Under the totality of the circumstances presented here, the Government fails to show how sitting motionless in a vehicle parked in a high crime residential area creates an objectively reasonable suspicion of loitering, criminal drug activity, or any other criminal activity.  First, the notion that Defendants sitting "frozen" inside a parked car within a high-crime apartment complex rises to the level of reasonable suspicion of illegal loitering is untenable in view of the text and statutory interpretation of Georgia's loitering laws.  Under Georgia law criminalizing loitering and prowling:

> (a) A person commits the offense of loitering or prowling when he is in a place at a time or in a manner not usual for law-abiding individuals under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity.

> (b) Among the circumstances which may be considered in determining whether alarm is warranted is the fact that the person takes flight upon the appearance of a law enforcement officer, refuses to identify himself, or manifestly endeavors to conceal himself or any object. Unless flight by the person or other circumstances make it impracticable, a law enforcement officer shall, prior to any arrest for an offense under this Code section, afford the person an opportunity to dispel any alarm or immediate concern which would otherwise be warranted by requesting the person to identify himself and explain his presence and conduct. . . .

O.C.G.A. § 16-11-36 (2010).   In a separate decision addressing an attack on this statutory provision as being void for vagueness, the Georgia Supreme Court upheld the loitering statute's constitutionality by emphasizing the statute's clear mandate that the

14

offense of loitering is committed when an actor engages in "conduct [that] must be that which would alarm a reasonable person that danger exists to person or property." Bell v. State, 313 S.E.2d 678, 680-81 (Ga. 1984); contrast Johnson v. Athens-Clarke Cnty., 529 S.E.2d 613, 615-16 (Ga. 2000) (holding unconstitutionally vague a local anti-loitering ordinance that criminalized loitering "under circumstances which cause a justifiable and reasonable alarm or immediate concern that such person is involved in unlawful drug activity" when it could subject an innocent person unfamiliar with drug culture to arrest and conviction for standing or sitting in a known drug area and returning to that area for a legitimate reason). The Georgia Supreme Court found applicable to the loitering statute commentary explaining that "[a]s a threshold matter, the section requires at least some manifestation of aberrant behavior [and] . . . the circumstances must be such that this behavior warrants alarm for the safety of persons or property in the vicinity." Id. at 680-81. (quoting comments to Section 250.6 of the Model Penal Code). As explained by the Court, the Georgia loitering statute "passe[d] constitutional muster in advising persons of *ordinary intelligence* of the conduct sought to be prohibited," as the statute itself was structured to avoid the possibility of arbitrary enforcement. Id. (emphasis added).

15

In the present case, Defendants were present at a place, time, and manner not unusual for a law-abiding individual.  Defendants were sitting motionless inside a vehicle parked within a residential apartment complex around 6:00 p.m., and Defendants did not flee nor endeavor to conceal themselves in their vehicle.  (Tr. 6-10, 28-30.)  At the same time, other cars and people were also present in the apartment complex, including people in a nearby swimming pool.  (Tr. 27, 38.)  Nothing of record indicates that Defendants engaged in any unusual behavior that would alarm a reasonable person as to the safety of persons or property in the vicinity; nor does the Government explain how observations by the officers prior to the initial seizure of Defendants amounts to reasonable suspicion of loitering.  Contrast United States v. Carr, 296 F. App'x 912, 916 (11th Cir. 2008) (upholding as reasonably suspicious observations of defendant and passenger loitering at 7:45 p.m. in parking lot of strip mall known for drug activity where defendant and passenger were sitting inside defendant's vehicle that was parked so as to obscure its license plate, where passenger in defendant's vehicle had been involved in previous incidents of loitering and drug activity, and where defendant and passenger appeared surprised at seeing the police and prepared to drive away); Gordon, 231 F.3d at 756 (finding reasonably suspicious of criminal activity defendant standing at night in high crime area near parked car, defendant quickly walking to car after making eye

16

contact with officer, and defendant subsequently driving off from police in the opposite direction); Evans v. State, 453 S.E.2d 100, 103 (Ga. Ct. App. 1995) (finding reasonably suspicious under O.C.G.A. § 16-11-36 occupants inside car that was observed in area known for automobile thefts and break-ins, that was circling around shopping center parking lot for forty-five minutes without parking, whose occupants did not leave to enter a store, and whose occupants were observed looking closely at another car); Hansen v. State, 308 S.E.2d 643, 644-46 (Ga. Ct. App. 1983) (finding reasonably suspicious under O.C.G.A. § 16-11-36 two men who were observed squatting down in parking lot next to car not properly parked in a space in apartment complex designated a high crime area and who later drove away and pulled off to the side of the road after passing the police).

Second, to the extent the Government argues Defendants' behavior supported a reasonable suspicion that Defendants were engaging in or about to engage in criminal drug activity, the facts present here fall significantly short of circumstances where courts have found reasonable suspicion of criminal drug activity.  See, e.g., United States v. Lopez-Garcia, 565 F.3d 1306, 1313-14 (11th Cir. 2009) (finding reasonable suspicion of criminal drug activity when defendant's car was stopped in roadway, car was in high crime area known for hand-to-hand drug transactions, an unknown person was seen

17

leaning into window and talking to defendant, and the unknown person and defendant abruptly departed upon seeing police); Powell, 222 F.3d at 917-18 (finding behavior that justified reasonable suspicion of drug activity when officers observed defendant leaving a known drug dealer's house, switching seats with a passenger in a car, riding around, returning, and leaving a backpack at the house); Justice v. City of Peachtree City, 961 F.2d 188, 194 (11th Cir. 1992) (finding reasonable suspicion of concealing contraband when officers observed plaintiff receiving something in an area suspected of drinking and drug activity, plaintiff appeared extremely nervous, plaintiff's friend's mother suspected her daughter of using drugs, and plaintiff was a female who officers thought was more likely to conceal contraband on her person).

Indeed, the Government provides no persuasive explanation for why the observation of Defendants' *lack* of movement in a high-crime residential area weighs in favor of finding that reasonable suspicion of a crime existed.  Binding precedent makes clear that the presence of an individual in a high crime area, alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. Wardlow, 528 U.S. at 124; Brown v. Texas, 443 U.S. 47, 52 (1979); Gordon, 231 F.3d at 756.  The undersigned is not convinced that basing reasonable suspicion of a crime upon officers' conclusions that sitting motionless inside a vehicle is "odd" sufficiently

18

distinguishes this scenario from one that solely bases reasonable suspicion on an individual's presence in a high crime area.  In <u>Wardlow</u>, for example, the Supreme Court held that although the defendant's presence in a heavy drug trafficking area was itself not enough to support reasonable suspicion of a crime, when coupled with the defendant's unprovoked flight upon noticing the police, reasonable suspicion existed to support an investigatory stop.  528 U.S. at 124-25.  Similarly, in <u>Gordon</u>, the Eleventh Circuit clarified that without the observation that the defendants fled at the approach of the police, defendants standing at night near a parked car in an area of largely abandoned buildings known for violent crime and drug trafficking would not have been enough to constitute reasonable suspicion for justifying a <u>Terry</u> stop.  231 F.3d at 756; <u>see also United States v. Momodu</u>, 909 F. Supp. 1571, 1575 (N.D. Ga. 1995) (holding that in addition to time of day and knowledge of prior criminal activity in the area, defendant's quick walking pace to and from his car and subsequent exit "at a rapid pace" out of the parking lot was not enough to establish reasonable suspicion in the absence of additional facts particular to defendant's conduct that are traditionally used to distinguish potential criminals from mere residents—such as apparent casing, flight, or stealthy movements).  Here, the record shows no indication that Defendants were attempting to evade police officers or flee the apartment complex.  Defendants made no attempt to move themselves

19

or the vehicle, and Defendants were in their car at around 6:00 p.m., a time where other cars and people were also present in the parking lot or nearby swimming pool of the complex. (Tr. 6-10, 27-30, 38.)

Further, the cases that the Government relies upon to argue that reasonable suspicion existed to seize Defendants turn on critical facts that are not present in the instant case. In United States v. Smith, 164 F. App'x 825 (11th Cir. 2006), for example, the officer initially stopped the defendant's vehicle based upon a potential traffic violation for failure to display a valid license tag. Id. at 828. The Eleventh Circuit further found reasonable suspicion to justify the continued detention of the defendant based on observations that the defendant's vehicle was parked next to a closed apartment complex office around 10:00 p.m., that the area was known for problems with vandalism and burglary, and that the officer—who provided security for the complex—did not recognize the vehicle as belonging to a resident. Id. Here, in contrast, the initial stop of Defendants was not prompted by a potential traffic violation. In addition, Defendants were not parked in front of a closed office at night, but, instead, were observed parked in front of an apartment building around 6:00 p.m. (Tr. 8-10.) In another case relied upon by the Government, United States v. Briggman, 931 F.2d 705 (11th Cir. 1991), the Eleventh Circuit affirmed the district court's finding of reasonable suspicion based on

observations that the defendant had parked in the parking lot of closed business establishments located in a high crime area at 4:00 a.m. and had attempted to evade the police. Id. at 709.  These facts are not present here, as Defendants were spotted in the residential complex at a reasonable time and did not show signs of evading police. Finally, in Ramirez v. City of Buena Park, 560 F.3d 1012 (9th Cir. 2009), United States v. DeJear, 552 F.3d 1196 (10th Cir. 2009), and United States v. Griffith, 533 F.3d 979 (8th Cir. 2008), the courts found reasonable suspicion to seize the defendants based on facts known to the officers *prior* to their seizure of the defendants.  See, e.g., Ramirez, 560 F.3d at 1020-21 (finding reasonable suspicion that defendant was under the influence of illegal stimulants after observing defendant parked in front of drugstore with parking lights on, defendant's seat reclined, defendant with his eyes closed and breathing rapidly, and defendant's "testy" response to officer upon tapping on his window); DeJear, 552 F.3d at 1200-01 (finding reasonable suspicion to detain defendant after officers observed defendant nervously stuffing something between the seats of a car parked in an area known for criminal activity and observed the car's backseat passenger holding a baseball bat); Griffith, 533 F.3d at 983-84 (finding reasonable suspicion to expand an initially consensual encounter into a Terry stop when officers were conducting patrols to exclude certain trespassers from an area known for drug-related activity,

21

officers saw a vehicle whose occupants appeared to observe police closely as they passed by, the owner of the vehicle became agitated and gave conflicting reasons upon the officer's questioning, and defendant was seen reaching under his front seat upon officers' approach).  None of these cases support a finding of reasonable suspicion based solely on a two to three minute observation of occupants sitting motionless inside a vehicle parked in front of an apartment building inside a complex known for prior criminal activity.  Taking into account the totality of the circumstances, the officers failed to articulate specific and articulable facts necessary to support a reasonable suspicion that objectively justifies the warrantless seizure of Defendants.[3]

_____

[3]The undersigned is aware that upon making reasonable suspicion determinations based on the totality of the circumstances, reviewing courts should allow "officers to draw on their own experience and specialized training to make inferences  from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"  United States v. Arvizu, 534 U.S. 266, 273 (2002); United States v. Lindsey, 482 F.3d 1285, 1290-91 (11th Cir. 2007).  The process of evaluating the validity of a Terry stop, however, deals with probabilities, not hard certainties, and "neither police officers nor courts should sanction as 'reasonably suspicious' a combination of factors that could plausibly describe the behavior of a large portion of the motorists engaged in travel upon our interstate highways." Tapia, 912 F.2d at 1371. The undersigned finds this warning aptly appropriate in the circumstances presented here, where the combination of factors cited by Officers Gray and Turman could plausibly describe the behavior of a large portion of individuals inside apartment complexes.

AO 72A
(Rev.8/82)

**B.**     **Subsequent Searches of Defendants' Persons and Apartment**

In light of the initial illegal stop, both Defendants argue that the evidence obtained from subsequent searches of Defendants and their apartment in addition to any statements made must be suppressed as fruits of the poisonous tree. In response, the Government does not directly refute whether the evidence and statements at issue constitute fruit of the poisonous tree, but the Government does assert that Defendant Saucedo-Espinoza voluntarily consented to the search of his pockets.

Evidence obtained from the subsequent search of Defendants and their apartment must be suppressed if they are exploitations of the initial illegality. Wong Sun v. United States, 371 U.S. 471, 488 (1963); United States v. Chanthasouxat, 342 F.3d 1271, 1280 (11th Cir. 2003). In determining whether such evidence must be excluded as "fruit of the poisonous tree," the relevant question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." United States v. Davis, 313 F.3d 1300, 1302-03 (11th Cir. 2002) (quoting Wong Sun, 371 U.S. at 488). A defendant's consent to a search may cure

the constitutional taint on evidence obtained in violation of the Fourth Amendment.[4]

Chanthasouxat, 342 F.3d at 1280.  To cure the taint on evidence obtained after an illegal

stop, the Government must prove that (1) the defendant's consent to search was

voluntary, and (2) his consent was obtained through means sufficiently distinguishable

from the illegal stop to be purged of the primary taint.  Id.  The Government bears the

burden of proving both issues.  United States v. Delancy, 502 F.3d 1297, 1308 (11th Cir.

2007).  The analysis of whether consent was obtained through exploitation of an initial

seizure, moreover,  must consider three factors: (1) the temporal proximity of the illegal

conduct and the consent; (2) the presence of intervening circumstances; and (3) the

purpose and flagrancy of the initial misconduct.  Chanthasouxat, 342 F.3d at 1280.

In the instant case, even assuming that both Defendants voluntarily gave the

officers consent to search their pockets, the Government fails to show how Defendants'

consent to search was purged of the primary taint from the initial illegal stop.  See

---

[4]The taint may also be "purged" if the Government demonstrates that there was
a break in the causal link between the initial illegality and challenged evidence, such as
by showing that (1) intervening events or circumstances independent of the primary
illegality have so attenuated the causal connection as to dissipate the primary taint, (2)
the evidence was obtained from a source independent of the primary illegality, or (3) if
the Government would have inevitably discovered the evidence without the aid of
unlawful police conduct. United States v. Bailey, 691 F.2d 1009, 1013 (11th Cir. 1982).
Here, however, the Government makes no argument on these grounds.

Chanthasouxat, 342 F.3d at 1281 (holding that defendant's consent was the product of an illegal seizure and finding it unnecessary to discuss whether defendant's consent was voluntary); United States v. Santa, 236 F.3d 662, 677 (11th Cir. 2000) (same). Immediately after the illegal seizure, Defendants were questioned, asked to produce identification, ordered to step out of their car, and then bodily searched. The temporal proximity of these events to the illegal seizure weighs in favor of concluding that the statements and evidence obtained from the subsequent questioning and searches were exploitations of the initial seizure. See Delancy, 502 F.3d at 1310 ("If only a short period of time has passed, a court is more likely to consider the consent as a 'poisonous fruit' of the illegal act—that is, that the consent is tainted."). In addition, any consent given by Defendants was asked and received after the officers had already began patting Defendants down, and the record shows no intervening events separated these events from the initial, unlawful seizure of Defendants by the officers. The undersigned further finds that given the initial detention of Defendants on facts that do not amount to reasonable suspicion, the third factor, which assesses the purpose and flagrancy of the initial conduct, weighs in favor of suppression. See Chanthasouxat, 342 F.3d at 1280 (concluding that the factor assessing "the purpose and flagrancy of the initial conduct" weighed in favor of suppression after finding that the initial stop violated defendants'

Fourth Amendment rights); see also United States v. Herrera-Gonzalez, 474 F.3d 1105, 1113 (8th Cir. 2007) (explaining that courts have found conduct purposeful and flagrant where (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up).  Because none of the subsequent acts by the officers were left untainted by the initial seizure, the statements and evidence obtained from the ensuing questioning and search of Defendants' persons and Apartment K-5 must be suppressed as fruits of the poisonous tree.[5]  See, e.g., 574 F.3d at 314-15 (suppressing evidence obtained in search resulting from initially unlawful Terry stop as fruit of the poisonous tree); United States v. Tyler, 512 F.3d 405, 408, 412 (7th Cir. 2008) (holding that because the officers lacked reasonable suspicion to justify the initial Terry stop of defendant, everything that followed—including a scuffle with officers that resulted in discovery of crack and powder cocaine—was fruit of the poisonous tree); United States v. Perkins, 348 F.3d 965, 971 (11th Cir. 2003) (excluding any statements and evidence seized from defendant's unlawful detention during which officers had questioned

---

[5]The search warrant of the apartment was based on information acquired during the initial seizure and subsequent bodily searches.  (See  Gov't Ex. 1.)

defendants and called in a canine unit); <u>see also</u> <u>Florida v. Royer</u>, 460 U.S. 491, 501 (1983) ("[S]tatements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will."). Consequently, without reaching the rest of the arguments raised in the parties' briefs, Defendants' motions to suppress evidence and statements obtained in the initial seizure and subsequent searches of Defendants and Apartment K-5 should be **GRANTED**.

**<u>DEFENDANT SAUCEDO-ESPINOZA'S SUPPLEMENTAL</u>**
**<u>MOTION TO SUPPRESS</u>**

On February 22, 2010, Defendant Saucedo-Espinoza filed a supplemental motion to suppress all evidence obtained from the search warrant on grounds that the search warrant itself was impermissibly procured through audio communications. Docket Entry [33]. Because the undersigned recommends that evidence obtained from the search warrant for the apartment be suppressed on other grounds, this motion should be **DENIED AS MOOT**.

**<u>CONCLUSION</u>**

For the foregoing reasons, this Court **RECOMMENDS** that Defendant Flores-Uriostegui and Defendant Saucedo-Espinoza's Motions to Suppress be **GRANTED** and

27

Defendant Saucedo-Espinoza's Supplemental Motion to Suppress be **DENIED AS MOOT**.  Docket Entries [20, 23, 25, 29, 33, 48].  As there are no further motions pending before the undersigned magistrate judge, this action is **CERTIFIED READY FOR TRIAL**.

      **SO REPORTED AND RECOMMENDED AND ORDERED**, this <u>9th</u> day of August, 2010.

<u>s/Linda T. Walker</u>                
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,            )
                                     )
                                     )       CRIMINAL CASE NO.
v.                                   )       1:09-CR-00438-JEC-LTW
                                     )
ANGEL FLORES-URIOSTEGUI and          )
EDGAR SAUCEDO-ESPINOZA,              )
                                     )
          Defendants.                )

## ORDER FOR SERVICE OF REPORT AND RECOMMENDATION

Attached is the report and recommendation of the United States Magistrate Judge made in this action in accordance with 28 U.S.C. § 636 and this Court's Local Rule 72.1C.  Let the same be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b) (1), **within fourteen (14) days after service of this order**, each party may file written objections, if any, to the Report and Recommendation.  Pursuant to Title 18, United States Code, Section 3161(h) (1) (F), **the above-referenced fourteen (14) days allowed for objections is EXCLUDED from the computation of time under the Speedy Trial Act.**

Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and

shall be served upon the opposing party.  The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the district court.  If no objections are filed, the report and recommendation may be adopted as the opinion and order of the district court and any appellate review of factual findings will be limited to a plain error review.  United States v. Slay, 714 F.2d 1093 (11th Cir. 1983), cert. denied, 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984).

The Clerk is directed to submit the report and recommendation with objections, if any, to the District Court after expiration of the above time period.

**SO ORDERED**, this 9th day of August, 2010.

s/Linda T. Walker
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE